***********
Upon review of the competent evidence of record with reference to the errors assigned, and finding no good grounds to receive further evidence or to rehear the parties or their representatives, the Full Commission upon reconsideration of the evidence reverses the Opinion and Award of the Deputy Commissioner.
 ***********
The Full Commission finds as fact and concludes as matters of law the following, which were entered into by the parties in their Pre-Trial Agreement and at the hearing as:
 STIPULATIONS
1. The Industrial Commission has jurisdiction over the subject matter of this case, the parties are properly before the Commission, and the parties were subject to and bound by the provisions of the North Carolina Workers' Compensation Act at all relevant times.
2. Federated Mutual Insurance Company was the carrier on the risk.
3. The employee-employer relationship existed between the parties at all relevant times.
4. Plaintiff sustained an admittedly compensable injury by accident on or about August 22, 2000. Defendants filed an I.C. Form 60 on or about November 16, 2000.
5. Plaintiff's average weekly wage was $560.00, which yields a weekly compensation rate of $373.35.
6. The issues for determination are:
 a. Does plaintiff require additional medical treatment as a result of the compensable injury?
 b. Have defendants' vocational rehabilitation professional has complied with the Commission's March 1, 2004 Order in procuring only suitable employment in light of plaintiff's physical limitations and pre-injury average weekly wage?
 c. Has plaintiff cooperated with vocational rehabilitation?
 d. Should plaintiff's temporary total disability benefits be terminated due to his failure to cooperate with vocational rehabilitation as ordered on September 23, 2003?
7. The parties stipulated the following documentary evidence:
a. I.C. forms and filings,
b. Medical records, and
c. Vocational rehabilitation records.
 ***********
Based upon the competent evidence of record, the Full Commission makes the following:
 FINDINGS OF FACT
1. At the time of hearing before the Deputy Commissioner, plaintiff was forty years old, had completed the seventh-grade and had been employed by defendant-employer as an electrician.
2. On August 22, 2000, plaintiff suffered an admittedly compensable injury to his neck, left shoulder and hand when he pulled a ladder off a truck while working for defendant-employer. Plaintiff was treated at Rowan Medical Center on September 20, 2000 for left shoulder pain.
3. On September 22, 2000, orthopedist Dr. H. Boyd Watts examined plaintiff for complaints of electric shocks, numbness and left arm pain, with tingling to his left index finger. Dr. Watts provided a Kenalog injection and recommended an MRI. The MRI revealed a C6-7 disc herniation.
4. On November 10, 2000, Dr. Watts gave plaintiff a cervical epidural which provided no improvement. Dr. Watts then referred plaintiff to Dr. Victoria Neave of Johnson Neurological Clinic.
5. Dr. Neave ordered a myelogram and post-myelogram CT, which revealed nerve root cut-off on the left at C6-7. She recommended an anterior cervical diskectomy and fusion at C6-7.
6. Plaintiff sought a second surgical opinion from Dr. Kevin Zitnay at Rowan Neurological on April 5, 2001. Dr. Zitnay concurred with Dr. Neave's recommendation.
7. On April 30, 2001, Dr. Neave performed the diskectomy. By May 14, 2001, plaintiff reported no left arm pain and only minimal neck pain. Plaintiff's diagnostic studies on May 28, 2001 were interpreted as normal.
8. On June 4, 2001, plaintiff returned to Dr. Neave, complaining of excruciating mid-neck pain which extended to his right shoulder. Dr. Neave ordered therapy with low weight cervical traction and iontophoresis over the posterior cervical spine and prescribed Flexeril, Prilosec, Anaprox and Percocet.
9. After therapy did not help, Dr. Neave referred plaintiff to Dr. Kevin L. Speight at High Point Regional Medical Center's anesthesia department. On July 2, 2001, Dr. Speight provided plaintiff with a right shoulder trigger point injection.
10. Dr. Neave ordered work conditioning and a functional capacity evaluation (FCE). The August 7, 2001 FCE indicated plaintiff was capable of light to medium level work.
11. As of August 27, 2001, Dr. Neave found plaintiff had reached maximum medical improvement and rated him as retaining a fifteen percent (15%) permanent partial impairment to his back. Dr. Neave recommended that plaintiff receive vocational counseling, as he could not return to work with his prior employer as an electrician.
12. Defendants retained VocMed to provide a labor market survey, facilitate the FCE and provide vocational counseling services to aid plaintiff in obtaining his GED and pursuing job search activities.
13. Dr. Maher Habashi provided a second opinion evaluation for plaintiff on October 25, 2001. He agreed that plaintiff was at maximum medical improvement and rated him as retaining a twenty-three percent (23%) permanent partial impairment to his back.
14. On August 12, 2002, plaintiff returned to Johnson Neurological Clinic, where Physician's Assistant Mark Payne saw him for complaints of continued left arm pain. Mr. Payne suspected ulnar neuropathy of the C7-T1 disc. Nerve studies were ordered.
15. The plaintiff returned to Dr. Neave on January 20, 2003 continuing to complain of ulnar neuropathy in his left arm at the time. Dr. Neave felt that plaintiff had not reached maximum medical improvement because "there are other things that can be done to help his pain." Dr. Neave referred the plaintiff for pain management.
16. On March 10, 2003, the plaintiff commenced pain management with Dr. Thomas L. Heil of Southeast Pain Care. Dr. Heil performed a brachial plexus nerve block on March 20, 2003 which gave plaintiff significant pain relief for a short period of time, then the pain returned to its "previous base line level." Due to the failure of plaintiff's symptoms to resolve, he was referred to Dr. Samuel Chewning for an evaluation regarding further surgery.
17. On July 7, 2003, Dr. Chewning opined that chronic pain management was definitely going to be necessary for the Plaintiff. Dr. Chewning restricted plaintiff to light level work with "restrictions on how much he can actually do with his left arm."
18. On August 8, 2003, Dr. Heil imposed permanent work restrictions for plaintiff of no lifting greater than 10 pounds on an occasional basis, no repetitive activity with the left arm or shoulder, no frequent bending or excessive twisting with the left shoulder, arm, or with the neck."
19. In August, 2003, the defendants authorized plaintiff's participation in the GED program at Rowan-Cabarrus Community College. Classes commenced in September of 2003.
20. Greg Henderson, a vocational rehabilitation professional, was assigned to plaintiff's case from June 13, 2003 to October 9, 2003. Plaintiff's vocational rehabilitation included getting a GED and looking for work. It was Mr. Henderson's opinion that Plaintiff needed at least a GED to find employment earning close to pre-injury wages. Plaintiff tested high enough on GED placement tests to enter the program without the need for adult basic skills classes. GED classes were held from 9:00 am. to 12:00 noon, four days a week. Participants were not required to attend every class, but regular attendance helps participants progress through the program quicker.
21. Mr. Henderson encouraged plaintiff to start with one hour a day and try to increase attendance. During the period Mr. Henderson worked with him, the plaintiff had to make several trips to the emergency room due to severe pain from sitting and looking down at a book.
22. Plaintiff did not believe he was employable and was reluctant to commence job search activities. At a counseling meeting, plaintiff advised Mr. Henderson that he was unlikely to be hired after a potential employer learns of his physical restrictions. Plaintiff informed Mr. Henderson that he was showing potential employers a written copy of his restrictions. When Mr. Henderson suggested that there are better ways of presenting physical limitations, plaintiff became argumentative because he felt Mr. Henderson was suggesting that he should lie to potential employers. Mr. Henderson ended the meeting and requested that the file be transferred to another rehabilitation professional.
23. Plaintiff missed only one scheduled appointment with Mr. Henderson and that missed appointment occurred because plaintiff did not receive the notice in time.
24. Mr. Henderson gave plaintiff a list of job leads but did not work with plaintiff long enough to do follow-up on job leads.
25. Based on the greater weight of the evidence, plaintiff cooperated with vocational rehabilitation efforts while working with Greg Henderson. The disagreement over how to present work restrictions did not constitute a failure to cooperate with vocational rehabilitation.
26. On August 27, 2003, defendants filed a Motion to Compel Plaintiff to Comply with Vocational Rehabilitation. On September 23, 2003, in response to defendants' Motion Executive Secretary Tracey Weaver issued an Order compelling the plaintiff to comply with vocational rehabilitation efforts.
27. On November 5, 2003, the defendants filed a Form 24 application to terminate or suspend plaintiff's benefits based upon the plaintiff's alleged failure to comply with the Commission's order of September 5, 2003. Defendants specifically alleged that the plaintiff was failing to comply with job search activities and also that he was failing to participate in the GED program.
28. Special Deputy Commissioner Robert J. Harris issued an Order disapproving the defendants' Form 24 application to terminate or suspend benefits. Defendants appealed to the Deputy Commissioner section from this Order.
29. Plaintiff was provided the vocational rehabilitation assistance of Brian D. Bernas in mid October, 2003. At the initial meeting, Mr. Bernas did not recall if plaintiff presented with his arm in a sling, but he was aware that plaintiff sometimes wore a sling when he was having unusual pain upon recommendation of his emergency room physician. Dr. Thomas Heil disagreed with the recommendation that plaintiff wear a sling.
30. At his October 29, 2003 meeting with plaintiff, Mr. Bernas testified that plaintiff went to class and he and plaintiff's wife went to purchase books for plaintiff. He recommended that plaintiff attend class as much as possible. He continued to focus on job search and GED efforts for plaintiff.
31. Mr. Bernas testified that he made face-to-face contacts with employers who might have suitable jobs available to give them a brief outline of plaintiff's restrictions and to determine their interest in considering plaintiff for employment. Job leads were then passed on to plaintiff. Mr. Bernas testified that during his first follow-up on whether plaintiff was contacting employers on the job list, around November 20, 2003, he determined that some employers did not have a job application for plaintiff on file, or plaintiff had presented his restrictions and the employer had noted that they were not able to accommodate his restrictions.
32. Mr. Bernas obtained letters from Holiday Inn, Trinity Oak Retirement Home, Sagebrush, City of Salisbury and Hampton Inn in December, 2003 stating plaintiff had not applied for employment. These businesses were on plaintiff's list of job leads. At some of the businesses where plaintiff did submit job applications in December, January and February he continued to provide his written restrictions and a list of medications to potential employers, despite the advice of Mr. Bernas and Mr. Henderson that the first contact with a potential employer was not the proper time to present this information.
33. Mr. Bernas noted that plaintiff continued to attend his GED class for one hour, one day per week and did not do any studying at home. Plaintiff informed Mr. Bernas that due to his pain level he could not sit in class longer.
34. Mr. Bernas was of the opinion that plaintiff's presentation of his job restrictions and list of medications to employers before he submitted applications, prevented plaintiff from obtaining job follow-up appointments.
35. In October, 2003, plaintiff reported to Dr. Heil that he had started GED classes and was having problems sitting in class. He requested more stringent restrictions. Dr. Heil declined to increase his restrictions, but prescribed muscle relaxers to deal with the neck spasms plaintiff was experiencing at that time. Dr. Heil was of the opinion that plaintiff could attend GED classes for the normal hours.
36. At his December 9, 2003 visit to Dr. Heil, plaintiff was having worsening problems with his neck, arm, back and leg. Dr. Heil recommended a T.E.N.S. unit and an epidural steroid injection. By March 4, 2004, plaintiff's back and leg symptoms were doing better and his neck and arm symptoms seemed more stable.
37. On or about May 12, 2004, plaintiff's vocational rehabilitation activities were suspended while mediation was pending. Plaintiff was informed that his file was on "hold" status. When Mr. Bernas resumed vocational rehabilitation activities at the end of May, 2004, plaintiff was visibly upset and said he had disposed of his GED books because it was his understanding that his file had been "closed for good." Plaintiff obtained new books.
38. Mr. Bernas continued vocational rehabilitation activities. Plaintiff continued to receive follow-up letters showing failure to follow-up with some of the job leads. Plaintiff took a GED pre-test which indicated his progress was slow, and his instructor recommended greater attendance in class.
39. Plaintiff attended the majority of his appointments with Mr. Bernas and he followed up on some of the job leads. Mr. Bernas testified that the job leads were for light to sedentary jobs and some potential employers had expressed a willingness to make accommodations. No job descriptions were placed into evidence for the jobs listed on plaintiff's job search list. According to Mr. Bernas, job descriptions are not generally presented to a doctor for approval as a standard protocol until the employer is ready to consider hiring the applicant. Plaintiff did not reach that point with any employer. On March 1, 2004, the Commission ordered that the vocational rehabilitation professional only seek "suitable" employment for plaintiff.
40. Plaintiff testified that he hurts every day, 24 hours per day. He testified that he hurts all the way down the neck and arm and around his "left shoulder blade awful bad." He drops things that he picks up with his left hand and his condition, in his opinion, is getting worse.
41. On June 29, 2004, plaintiff was involved in an incident where he was thrust forward when the driver of the car in which he was riding suddenly applied brakes to avoid a collision.
42. Plaintiff has doctor restrictions advising him not drive while taking medications. Plaintiff also has limitations on turning his neck from side to side due to his injury. Mr. Bernas understood from the nurse case manager that plaintiff could attend GED classes, but the doctor left it up to plaintiff as to how regular he could attend.
43. By July 6, 2004, plaintiff appeared to have suffered a "setback" with respect to his neck, shoulder and arm symptoms. He had begun to drop things at home and his pain had worsened causing him to seek emergency room treatment. Dr. Heil ordered an MRI which showed a change in plaintiff's condition from the previous June 19, 2003 MRI. Plaintiff had "a congenital and narrow central canal along with a left sided paracentral disc protrusion at C4-5 that was pushing on the spinal cord and a less significant bulge at the level above that." Dr. Heil noted that plaintiff was "unable to lift his arm above his shoulders." By September 9, 2004, Dr. Heil was of the opinion that in light of the new symptoms, plaintiff restrictions probably should be made tighter and he should not do anything at all.
44. According to Dr. Heil, plaintiff's spine is narrower than the average person and if a disc bulge or herniation develops it takes less damage for these conditions to become symptomatic. He recommended that plaintiff be seen by a neurosurgeon. Dr. Heil was concerned because plaintiff's disc bulge was pressing against his spinal cord and was pinching off a cord. It was Dr. Heil's opinion that plaintiff's congenital narrowing of the spinal cord combined with his fusion was more likely than not causing his problems.
45. The medical restrictions given to plaintiff by Dr. Heil are significantly greater than the restrictions used for the Labor Market Survey which was conducted on March 8, 2002. Mr. Bernas and Mr. Henderson included the following jobs (among others) on plaintiff's list of job search leads without providing plaintiff or Dr. Heil with job descriptions to determine if the jobs were suitable or what parts of the jobs would be within plaintiff's physical restrictions: custodian, park attendant, cashier, front desk clerk at Advance Auto Parts, Customer Assistance Lowe's Hardware; Cook at Bojangles, McDonalds, Hardees, KFC, K W Cafeteria; Clerk at Amoco Food Shop; Food Bar Attendant, Delivery for Flower Shop; Tool Rental; Hotel Maintenance; Dietary Nutritionist; Presser; Restaurant Host; Night Desk Clerk; Dispatcher; Police Communicator; Gas Attendant; Forklift Operator; Assembly, Counter Help, Yarn Preparation, Customer Service, Security Guard, Linen Distribution Assistant Manager Trainer.
46. Despite the testimony and opinion of Mr. Bernas and Mr. Henderson, there is insufficient evidence from which to find that the jobs listed on plaintiff's contact list were suited to plaintiff's work restrictions as assigned by Dr. Heil. There is also insufficient evidence from which to find that the jobs were suitable for plaintiff considering vocational factors other than his physical work restrictions. Dr. Heil was not asked whether plaintiff could have performed any of the duties associated with any of the listed jobs, except driving. The evidence establishes that plaintiff can drive but he also takes narcotic pain medication, so safety could be an issue.
47. At the time of defendants August 27, 2003 Motion to Compel Plaintiff to Comply with Vocational Rehabilitation and the entry of the Executive Secretary Order directing Plaintiff to comply, plaintiff was receiving assistance from Greg Henderson and was reasonably cooperating.
48. At the time defendants filed a Form 24 application to terminate or suspend Plaintiff's compensation on November 5, 2003, plaintiff had just begun to work with Mr. Bernas and was reasonably cooperating. Mr. Bernas did not conduct his first follow up on job leads until November 20, 2003. There is evidence that plaintiff did not apply for all of the jobs listed on his jobs leads list provided by Mr. Bernas and there is evidence that many of the jobs would likely exceed the restrictions imposed by Dr. Heil which are found to be credible and persuasive. Plaintiff's testimony about the increase in his pain level due to GED class attendance is found to be credible.
49. Based on the greater weight of the evidence, plaintiff was totally disabled from participation in vocational rehabilitation activities by September 9, 2004.
50. Any failure on plaintiff's part to cooperate with vocational rehabilitation was reasonable and justified, considering all of the evidence.
 ***********
Based on the foregoing Findings of Fact the Full Commission concludes as follows:
 CONCLUSIONS OF LAW
1. On August 22, 2000, Plaintiff sustained an injury by accident to his cervical spine arising out of and in the course of his employment with Defendant/Employer. N.C. Gen. Stat. § 97-2(6).
2. On August 22, 2000, the Plaintiff's average weekly wage was $560.03, resulting in a corresponding compensation rate of $373.35. N.C. Gen. Stat. § 97-2(5).
3. Plaintiff is unable to return to his employment with Defendant-employer and continues to be disabled. N.C. Gen. Stat. § 97-29.
4. N.C. Gen. Stat. § 97-25 provides that failure to cooperate with rehabilitation efforts can justify suspension of benefits, after the plaintiff is ordered to cooperate. However, when refusal to cooperate is justifiable, benefits should not be terminated. Dixon v. City of Durham,
120 N.C. App. 495 S.E.2d 380 (1998).
5. "Suitable employment" is defined by Rule III, G. of the Industrial Commission Rules for Utilization of Vocational Rehabilitation Professionals in Workers' Compensation cases as follows:
 "Suitable employment means employment in the local labor market or self-employment which is reasonably attainable and which offer an opportunity to restore the worker as soon as possible and as nearly as practicable to pre-injury wage, while giving due consideration to the worker's qualifications (age, education, work, experience, physical and mental capabilities), impairment, vocational interests, and aptitudes. No one factor shall be considered solely in determining suitable employment."
6. Defendants have produced insufficient evidence from which to find that the jobs the vocational rehabilitation professionals identified as job leads for plaintiff were "suitable."
7. Plaintiff's failure to maintain regular class attendance while working toward his GED is justifiable.
 ***********
Based upon the foregoing Findings of Fact and Conclusions of Law, the Full Commission enters the following:
 AWARD
1. Defendants' request that Plaintiff's ongoing total disability benefits be terminated or suspended is DENIED.
2. Defendants shall continue to pay temporary total disability compensation to plaintiff from the time of termination pursuant to the Opinion and Award of the Deputy Commissioner to the present and continuing until further order of the Commission.
3. A 25% attorney fee is awarded to plaintiff's attorney. The fee shall be deducted from the accrued compensation due plaintiff and paid directly to plaintiff's attorney. Thereafter, plaintiff's attorney shall receive every fourth check from the compensation due plaintiff.
4. Defendants shall pay all past and future medical expenses for treatment reasonably related to plaintiff's compensable injury.
5. Defendants shall pay the costs.
This the 16th day of December 2005.
 S/ ______________________ BERNADINE S. BALLANCE COMMISSIONER
CONCURRING:
 S/ ______________________ PAMELA T.YOUNG COMMISSIONER
S/ ______________________
 CHRISTOPHER SCOTT COMMISSIONER